**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Osvaldo G.D.,<br><br>Petitioner,<br><br>v.<br><br>Todd Blanche, et al.,<br><br>Respondents. | No. 26-cv-4070 (KMM/DJF)<br><br><br><br>**ORDER** |

---

Since September 18, 2026, Petitioner Osvaldo G.D. ("Petitioner" or "Mr. G.D.") has been detained by federal immigration authorities at the Freeborn Adult Detention Center in Albert Lea, Minnesota. (Pet., Dkt. 1 ¶¶ 17–19.) Mr. G.D. filed the pending Petition for Writ of Habeas Corpus to challenge his ongoing detention. He claims his arrest was unlawful because Immigration and Customs Enforcement ("ICE") agents failed to issue an administrative warrant before his arrest, and lacked a lawful basis to conduct a warrantless arrest. (*Id.* ¶¶ 56–58.) Additionally, he claims that his ongoing detention violates the Due Process Clause of the Fifth Amendment—first, because Respondents did not properly revoke his conditional parole (*Id.* ¶ 47) and, second, because Respondents have made no individualized inquiry into whether ongoing detention is necessary to ensure Mr. G.D.'s appearance in immigration court or to protect the community (*Id.* ¶¶ 48–53).

Respondents oppose this Petition. With respect to his Fifth Amendment claims, they first argue that under the relevant provisions of the Immigration and Nationality Act, Mr. G.D. is subject to mandatory detention until the conclusion of removal proceedings and,

second, argue that Petitioner's due process argument is foreclosed by existing precedent. (Resp., Dkt. 5 at 2–15.) Regarding the legality of his arrest, Respondents argue that he cannot challenge the lawfulness of his arrest since he is now in removal proceedings and, also, that his arrest complied with governing law. (*Id.* at 15–27.) For the reasons that follow, Mr. G.D.'s Petition is granted in part and denied in part. Respondents are ordered to provide him with a prompt bond hearing.

## BACKGROUND

Mr. G.D. is a citizen of Mexico. He arrived at the U.S.-Mexico border with members of his family sometime in mid-October of 2023, when he was still a minor. (*See* Dkt. 1 ¶¶ 11, 13 (noting that Mr. G.D. "has lived in the United States since on or around October 14, 2023"); *cf.* Decl. of James Vandervaart, Dkt. 6 ¶ 4 (noting that Petitioner "entered the United States without inspection on or about October 12, 2023").) Upon his arrival, the Department of Homeland Security ("DHS") detained Mr. G.D. and initiated removal proceedings against him by issuing a Notice to Appear. (Dkt. 6 ¶ 5; *see also* Dkt. 6-2.) After a short period, DHS released Mr. G.D. and his family on an Order of Release on Recognizance. He and his family attended their initial hearing for removal proceedings on April 22, 2024. (Dkt. 1 ¶ 13.) Since those initial proceedings, Mr. G.D. has applied for asylum and withholding of removal, and he has obtained a work permit. His applications remain pending. (*Id.* ¶ 12; Reply, Dkt. 7 at 6.) He has also remained in compliance with state and federal law. (Dkt. 1 ¶ 16.)

On September 18, 2026, Mr. G.D. was exiting his vehicle in the parking lot of his place of work when ICE agents arrested him. (*Id.* ¶ 17.) He alleges that the arresting agents

did not show him a valid warrant when they arrested him. (*Id.* ¶ 18.) The agents then transported Mr. G.D. to Fort Snelling for "post-arrest administrative processing," at which point an ICE agent issued a Form I-200 warrant for his arrest. (Dkt. 6 ¶ 6.) Eventually, ICE transferred Mr. G.D. to the Freeborn Adult Detention Center in Albert Lea, where he is still being held. (Dkt. 1 ¶ 19.)

## DISCUSSION

District courts may grant a petition for a writ of habeas corpus when the petitioner is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). The Petitioner has the burden of proving that his detention is illegal by a preponderance of the evidence. *Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 965 (D. Minn. 2025).

The Court begins with Mr. G.D.'s claim that ICE agents unlawfully arrested him, concluding that even though an I-200 warrant had not yet been issued, ICE agents did have probable cause to conduct a warrantless arrest. Next, the Court addresses Mr. G.D.'s constitutional due process claim and finds that continued detention without procedural protections does violation Petitioner's due process rights. Mr. G.D. is entitled to habeas relief as a result.

## I. Unlawful Arrest Claim

Petitioner claims that he is entitled to an order requiring Respondents to immediately release him from custody because ICE agents conducted an unlawful arrest. There are "two mechanisms by which 'it is appropriate to arrest an alien during the removal process.'" *Cesar F.F. v. Blanche*, No. 26-cv-2540 (PJS/DTS), Dkt. 8 at 3 (D. Minn. June 2, 2026) (quoting *Arizona v. United States*, 567 U.S. 387, 407 (2012)). Both are creatures of

statute. First, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Second, immigration enforcement officers may arrest a noncitizen, in some cases without a warrant, under limited circumstances outlined in 8 U.S.C. § 1357.

Under the first mechanism, immigration authorities may arrest a noncitizen during the pendency of removal proceedings pursuant to an administrative warrant known as a Form I-200 Warrant of Arrest. 8 C.F.R. § 236.1(b)(1). Ordinarily, Form I-200 warrants are issued in connection with removal proceedings initiated pursuant to 8 U.S.C. § 1226, which establishes a "discretionary detention framework" where persons detained receive bond hearings prior to an order requiring detention. *See Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 969 (D. Minn. 2025). The discretionary detention contemplated by this statute also allows the government to "release the alien on . . . bond of at least $1,500 . . . or . . . conditional parole." 8 U.S.C. § 1226(a)(2).

A Form I-200 warrant is valid when it is issued at the same time as ICE issues a Notice to Appear ("NTA"), or any time after the NTA has been issued. 8 C.F.R. § 236.1(b)(1)*; Martha C.G.P. v. Blanche*, No. 26-cv-2308 (DWF/JFD), 2026 WL 1329577, at *3 (D. Minn. May 13, 2026) ("Respondents may arrest a noncitizen using a Form I-200 only if the Form I-200 issues at the same time or after the Department of Homeland Security issues an NTA." (citing 8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(b)(1))). Courts have held that an arrest is made "pursuant to" an I-200 warrant when the warrant is issued prior to that arrest. *Makitio G. A. v. Blanche*, No. 26-cv-2200 (ECT/DLM), 2026 WL 1584457, at *4 (D. Minn. May 22, 2026) ("[I]f a removal warrant for [the noncitizen] was

not procured until . . . after his . . . arrest, that means he was arrested without a warrant."), *report and recommendation adopted*, 2026 WL 1591270 (D. Minn. June 3, 2026); *cf. Pina C.D.B. v. Bondi*, No. 26-cv-1929 (KMM/DJF), 2026 WL 810676, at *2 (D. Minn. Mar. 24, 2026) (collecting cases holding 8 U.S.C. § 1226(a)'s "[o]n a warrant" language requires the issuance of a warrant prior to arrest).

Immigration officers can also arrest a noncitizen under the warrantless-arrest authority provided in 8 U.S.C. § 1357. The relevant portion of that statute states that such an arrest is permissible only if there is "reason to believe that the alien so arrested is in the United States in violation of any [immigration] law or regulation *and* is likely to escape before a warrant can be obtained for his arrest[.]" 8 U.S.C. § 1357(a)(2) (emphasis added). By its plain language, 8 U.S.C. § 1357(a)(2) contains two separate requirements: (1) that the individual is in the United States in violation of immigration laws; and (2) that he is likely to escape before a warrant can be obtained for his arrest. And in this context, "the term 'reason to believe' . . . means constitutionally required probable cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).

***Arrest with an Administrative Warrant***

Respondents first assert that Petitioner is unable to challenge his arrest in the habeas context because immigration proceedings are currently pending, relying on the Seventh Circuit's decision in *Arias v. Rogers*, 676 F.2d 1139, 1143–44 (7th Cir. 1982), to support their claim. (Dkt. 5 at 15–20.) This Court has previously rejected the government's argument that an unlawful arrest cannot result in relief from custody in a habeas proceeding. *E.g.*, *Emily Andreina N.V. v. Blanche*, No. 26-cv-2570 (KMM/EMB), 2026 WL

2209844, at *4–5 (D. Minn. July 31, 2026). And like other courts in this District, this Court "decline[s] to adopt *Arias* for the propositions that a habeas petitioner in removal proceedings cannot challenge an unlawful arrest or that release is not the appropriate remedy." *Elder C.C. v. Blanche*, No. 26-cv-03832 (ECT/ECW), 2026 WL 3025948, at *3 (D. Minn. Oct. 8, 2026); *Wilfredo C.M. v. Blanche*, No. CV 26-3966 (JRT/DJF), 2026 WL 2875061, at *2 (D. Minn. Sept. 24, 2026) (same).

Addressing the legality of the arrest itself, Respondents next argue that it was lawful because they obtained an I-200 administrative warrant. Respondents claim that there were no procedural defects with respect to the issuance of the I-200 warrant in this case. (Dkt. 5 at 20–22.) The Court agrees with Respondents' assessment that I-200 warrants identify "*who* can serve the warrant rather than *on whom* the warrant can be served." (*Id.* at 21.) But Respondents' argument that no procedural defects exist because the "Form I-200 was served after the issuance of the NTA" and "during the processing of the current detention" (*see id.* at 21–22) fails to demonstrate that the arrest in this case was made pursuant to a valid administrative warrant.

As discussed above, for an I-200 warrant to be valid, it must be *issued* before an arrest is made.[1] *See Jaminton R.B. v. Mullin*, No. 26-cv-3091 (ECT/JFD), 2026 WL 2350324, at *2–3 (D. Minn. Aug. 13, 2026) (concluding that the petitioner was arrested

[1] To the extent Mr. G.D. claims that his arrest was unlawful because the I-200 warrant was not *served* until after he was arrested (*see* Dkt. 1 ¶ 56 (noting that "Respondents did not serve any administrative warrant on [Petitioner] when they detained him")), the Court disagrees that the law requires *service* prior to arrest. *E.g.*, *Hector Luis P.M. v. Blanche*, No. 26-cv-4211 (KMM/ECW), 2026 WL 3150681, at *3 (D. Minn. Oct. 21, 2026) (citing cases).

without a warrant where the record did not support a conclusion that the warrant was issued prior to the arrest); *Nelson E.T.N. v. Venturella*, No. 26-cv-3541 (JRT/DLM), 2026 WL 2364527, at *2 (D. Minn. Aug. 14, 2026) (concluding that the petitioner's detention was unlawful where no persuasive evidence was submitted to the court indicating that the sequencing of the NTA, Form I-200 arrest warrant, and arrest were appropriate); *David V.T. v. Blanche*, No. 26-cv-4091 (KMM/JFD), 2026 WL 3205948, at *3 (D. Minn. Oct. 26, 2026) (concluding that without evidence showing that a warrant was issued prior to arrest, a petitioner's arrest cannot be said to have complied with administrative warrant procedures).

The record evidence, provided by both parties, establishes that Mr. G.D. was taken into custody prior to the issuance of a Form I-200 warrant, and that it wasn't until Mr. G.D. was transferred to Fort Snelling that an ICE agent prepared the document. (Dkt. 6 ¶ 6; Dkt. 1 ¶¶ 17–18, 56.) Indeed, Respondents' own narrative report of the encounter indicates that the ICE officers who made the arrest did so without a warrant. (Dkt. 6-1 at 2 (stating that a "warrantless arrest was utilized" when a team of ICE agents stopped Petitioner's vehicle).) The only conclusion supported by the record here is that Respondents arrested Petitioner first and then prepared an I-200 warrant after the fact. Respondents have not cited binding or persuasive legal authority for the proposition that the subsequent issuance of an administrative warrant can transform an arrest made without a warrant into an arrest supported by a warrant. The Court, therefore, rejects Respondents' suggestion that Mr. G.D.'s arrest occurred without any procedural defects.

***Probable Cause for a Warrantless Arrest under § 1357(a)(2)***

Respondents next argue that even if they lacked a timely I-200, Mr. G.D.'s arrest was lawful under § 1357(a)(2) because the arresting agents had both reasonable suspicion to interrogate and probable cause to arrest him at the time of their encounter. (Dkt. 5 at 22–26.) Respondents contend that discrepancies between different databases with respect to Mr. G.D.'s home address and the fact that he owned and was operating the vehicle that got pulled over established probable cause. (Dkt. 5 at 23–24.) The Court, for reasons articulated below, credits one of these arguments and concludes that officers did sufficiently establish probable cause to justify their warrantless arrest of Mr. G.D.

Factors such as proximity to a vehicle or ownership of the vehicle being targeted by ICE are not sufficient to establish probable cause for a warrantless arrest. The "likely to escape" prong informing warrantless arrest procedures requires more, considering "not just whether the noncitizen will be located at the scene of encounter with immigration enforcement but also whether immigration enforcement would be able to arrest the noncitizens at another clearly identifiable location." *Walther A.S. v. Blanche*, No. 26-cv-2804 (LMP/SGE), 2026 WL 1734906, at *3 (D. Minn. June 16, 2026) (quotation omitted). Therefore, any suggestion that such a factor could, alone, justify M.G.'s arrest is not persuasive.

The Court's analysis with respect to one factor, however, does not foreclose that another factor may justify characterization of someone as a flight risk. This is particularly the case when such consideration happens quickly by ICE agents making decisions at the time of the encounter. (*See e.g.*, Dkt. 6-1 at 2 ("A warrantless arrest was utilized because

the subject was in a near his vehicle with access to his key, did not register his address with immigration as required, and already admitted to officers of being in the country without proper documentation.").) Here, ICE agents expressed that in their initial conversations with Mr. G.D. they discovered that the address listed in his driving record was not the same as the address he had previously provided to DHS. (Dkt. 5 at 23–24.) Given the requirement that Mr. G.D. keep DHS apprised of his address, what they believed was his failure to do so, and the ambiguity about his current address, the Court concludes that ICE officers conducting the arrest did so within the bounds of § 1357(a)(2).[2] (*Id.*)

Based on the discussion above, the Court concludes that Petitioner was not arrested pursuant to a valid I-200 warrant, but that his warrantless arrest complied with the requirements of 8 U.S.C. § 1357(a)(2). As a result, the Court will not grant Mr. G.D.'s petition on this basis alone. The Court turns to Mr. G.D.'s procedural due process claim next.

---

[2] The Court acknowledges that this is a close call. In coming to this conclusion, the Court does not suggest that issues with one's address will always provide justification for ICE agents to conduct a warrantless arrest. *See e.g.*, *Elder C.C.*, 2026 WL 3025948, at *2 (declining to find probable cause that the petitioner was likely to escape before a warrant could be obtained); *Manual P.N. v. Easterwood*, No. 26-cv-3799 (ECT/DJF), 2026 WL 2823650, at *2 (D. Minn. Sept 21, 2026) (finding no support for a warrantless arrest under § 1357's likely-to escape prong where the noncitizen was stopped in a vehicle, admitted he was not legally in the United States, did not register an address with DHS, and lacked identification showing that address). But, here, the facts that were available to ICE agents at the time of their encounter with Mr. G.D., coupled with the lack of information provided by Mr. G.D.'s counsel during briefing to explain why Mr. G.D. hadn't updated his address or to challenge the veracity of that factual detail, leads the Court to credit Respondents' assertion that they believed Mr. G.D. was "likely to escape" were they to release him and attempt to rearrest him after issuance of the I-200 warrant. And Mr. G.D. bears the burden of proof on this issue.

## II. Due Process Claim

In his Petition, Mr. G.D. also claims that redetention without any individualized inquiry violates his right to due process of law under the Fifth Amendment. Respondents argue that he is not entitled to such a bond hearing because "Section 1225(b) requires mandatory detention and does not require such determinations."[3] (Dkt. 5 at 8.) They also assert that Petitioner's due process claim is foreclosed by several decisions of the U.S. Supreme Court and the Eighth Circuit, among them: *Demore v. Kim*, 538 U.S. 510 (2003); *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020); and *Banyee v. Garland*, 115 F.4th 928 (8th Cir. 2024). As this Court and others in this District have previously held, however, the Court concludes that Mr. G.D. has rights under the Due Process Clause notwithstanding his illegal entry into the United States, and the failure to provide him with an individualized determination of the necessity of his detention because an act of Congress makes him subject to mandatory detention violates those rights.

### A. The Due Process Clause Applies to Petitioner

Under the Fifth Amendment's Due Process Clause, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. That protection from deprivation extends to all persons, including noncitizens who entered the United States unlawfully. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (explaining that the due process clause applies to every person in the United States "whether their presence

[3] *Avila* does not address any constitutional limitations upon the authority Congress provided in § 1225(b)(2)(A) to detain an "applicant for admission" pending completion of removal proceedings. 170 F.4th at 1140 n.8 (Erickson, J., dissenting).

here is lawful, unlawful, temporary, or permanent"); *Osman J.M.A. v. Blanche*, No. 26-cv 2123 (DWF/DJF), 2026 WL 1005056, at *2 (D. Minn. Apr. 14, 2026). The fact that Mr. G.D. entered the United States without inspection and lacks legal status does not mean that the protections of the Due Process clause do not apply to him. And because he has lived in the United States for multiple years, if the government seeks to deprive Mr. G.D. of his liberty, the Due Process Clause entitles him to some process.

That is so because "[f]reedom from physical restraint 'lies at the heart of the liberty' that the Due Process Clause protects." *Felipe S.P. v. Blanche*, No. 26-cv-2212 (NEB/DJF), 2026 WL 1911656, at *2 (D. Minn. July 2, 2026) (quoting *Zadvydas*, 533 U.S. at 690). Indeed, freedom "from physical detention is the most elemental of liberty interests." *Id.* (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion)). And while it is true that "Congress has plenary power over immigration, and the Executive Branch has broad discretion in enforcing immigration laws[,] . . . the exercise of that power must comply with the Constitution." *Felipe S.P.*, 2026 WL 1911656, at *2 (citations and quotations omitted). "Detention is a constitutionally permissible part of removal proceedings. . . . But in this context, it implicates an important liberty interest protected by the Due Process Clause, so it must serve a constitutionally acceptable purpose." *Id.* (cleaned up).

The Supreme Court has made clear that outside of detention in connection with criminal proceedings, when the government seeks to deprive a person of liberty in a civil

matter,[4] the Due Process Clause allows it to do so only "in certain special and narrow nonpunitive circumstances . . . where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (cleaned up). And so, the question becomes what constitutionally acceptable purpose is served by the detention of a noncitizen under 8 U.S.C. § 1225(b)(2). In the immigration context, the Supreme Court has recognized that the government's interests in preventing flight and protecting the community may support detention. *See Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) ("Detention during [immigration] proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made."). Like other courts, this Court finds the government's interests in "[e]nsuring appearance at future proceedings and limiting threats to public safety are interests that can justify detaining noncitizens . . . ." *Felipe S.P.*, 2026 WL 1911656, at *4; *Anthony Javier R.M. v. Blanche*, No. 26-cv-2283 (LMP/DLM), 2026 WL 1506306, at *9 (D. Minn. May 29, 2026). But in this case, Mr. G.D.'s claim is that "by denying him any procedure for assessing his danger or flight risk, the government has taken his liberty in violation of the Due Process Clause." *Felipe S.P.*, 2026 WL 1911656, at *4.

---

[4] Removal proceedings are "a civil, not criminal, matter," *Arizona v. United States*, 567 U.S. 387, 396 (2012), and "[u]nlawful presence within the United States, by itself, is not a criminal offense," *Anthony Javier R.M. v. Blanche*, No. 26-cv-2283 (LMP/DLM), 2026 WL 1506306, at *5 (D. Minn. May 29, 2026).

**B. *Demore*, *Banyee*, and *Thuraissigiam***

The Court finds that the Supreme Court and Eighth Circuit decisions relied upon by Respondents—*Demore*, *Banyee*, and *Thuraissigiam*—do not preclude a ruling in Petitioner's favor on his due process claim for largely the same reasons articulated by United States District Judges Laura M. Provinzino in *Anthony Javier R.M. v. Blanche*, No. 26-cv-2283 (LMP/DLM), 2026 WL 1506306 (D. Minn. May 29, 2026), and Nancy E. Brasel in *Felipe S.P. v. Blanche*, No. 26-cv-2212 (NEB/DJF), 2026 WL 1911656 (D. Minn. July 2, 2026).

***Demore* and *Banyee***

Turning first to *Demore* and *Banyee*, the Court concludes that neither decision forecloses Petitioner's due process claim for two reasons. First, those cases both considered a different provision of the Immigration and Nationality Act, and that difference matters. Both *Demore* and *Banyee* addressed due process challenges to the mandatory detention scheme established by 8 U.S.C. § 1226(c). Unlike the detention authorized by § 1225(b)(2), under section 1226(c) detention is required pending the completion of removal proceedings for certain "criminal aliens." *See Demore*, 538 U.S. at 513. In relevant part, § 1226(c) provides that the Secretary of Homeland Security "shall take into custody" noncitizens with specific criminal histories, including those who have "committed" crimes of moral turpitude or aggravated felonies. 8 U.S.C. § 1226(c)(1)(B)–(C) (cross referencing, *inter alia*, 8 U.S.C. § 1227(a)(2)(A)(i)–(ii)).[5] Both petitioners in *Demore* and *Banyee* had been

[5] Section 1226(c) now also requires DHS to detain noncitizens who have been charged with, arrested for, or convicted of "burglary, theft, larceny, shoplifting, or assault

convicted of at least one aggravated felony. *Demore*, 538 U.S. at 513; *Banyee*, 115 F.4th at 930. The discussion in *Anthony Javier R.M.* aptly describes the context of *Demore* and *Banyee*:

> In *Banyee*, the petitioner, a lawful permanent resident, was convicted of armed robbery. *See* 115 F.4th at 930. He was placed in removal proceedings and detained under Section 1226(c). *Id.* Although he was initially granted cancellation of removal by an immigration judge, the BIA reversed and remanded. *Id.* On remand, the petitioner was ordered removed by the immigration judge, and he appealed the order of removal to the BIA. *See id.* The petitioner, who by this point had been detained in a county jail for one year, sought habeas relief while that appeal was pending, challenging his "lengthy detention" during the removal proceedings on due process grounds but not "directly contesting the grounds for his mandatory detention." *Id.* at 930–31. The Eighth Circuit rejected the petitioner's argument, concluding that "the [g]overnment may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Id.* at 931 (alteration in original) (quoting *Demore*, 538 U.S. at 526).
>
> Similarly, in *Demore*, the petitioner had been convicted of at least one aggravated felony offense. 538 U.S. at 513. He did not "dispute the validity of his prior convictions" or the government's "conclusion that he [was] subject to mandatory detention under § 1226(c)," and he "conced[ed] that he was deportable." *Id.* at 513–14. Instead, the petitioner argued that his detention under Section 1226(c) violated the Due Process Clause because the government "had made no determination that he posed either a danger to society or a flight risk." *Id.* at 514. The Supreme Court rejected the petitioner's argument and affirmed that his detention without a bond hearing was

of a law enforcement officer, or any crime that results in death or serious bodily injury to another person" 8 U.S.C. § 1226(c)(1)(E)(ii). These provisions were added to § 1226(c) in January 2025 as part of the Laken Riley Act, Pub. L. No. 119-1, 130 Stat. 3 (2025). Both *Banyee* and *Demore* addressed older versions of the statute. In any event, there is no evidence that Mr. G.D. has been arrested or convicted of any offense that would render any portion of § 1226(c) applicable to him, and Respondents do not suggest otherwise.

> constitutionally permissible. *See id.* at 530. Critical to *Demore*'s holding—and *Banyee* to the extent it relies on *Demore*—was Congress's reliance, in enacting Section 1226(c), on findings supporting its "justifiabl[e] concern[ ] that deportable criminal aliens who are not detained [would] continue to engage in crime and fail to appear for their removal hearings." *Id.* at 513. The Supreme Court therefore reasoned that the "narrow detention policy reflected in 8 U.S.C. § 1226(c)," as applied to the class of criminal noncitizens in removal proceedings, was constitutionally permissible because "[s]uch detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Id.* at 526, 528. In effect, the consideration of dangerousness and risk of nonappearance is already baked into Section 1226(c).

*Anthony Javier R.M.*, 2026 WL 1506306, at *4.

From this background, Judge Provinzino observed that because the version of § 1226(c) in effect "when *Demore* and *Banyee* were decided" focused on the mandatory detention of noncitizens "who had been convicted of criminal offenses," and had received procedural protections from the criminal justice system, the due process concerns raised by that subsection's mandatory detention scheme were lessened. *Id.* (quoting *Demore*, 538 U.S. at 513, and citing *Gomez v. Bondi*, No. SA-26-CA-00727-XR, 2026 WL 753307, at *12 (W.D. Tex. Mar. 13, 2026) (noting that "the convictions themselves may stand in for the individualized determination that might otherwise be taken up at a bond hearing, by demonstrating either that the noncitizen is a danger to the community or a flight risk")); *see Felipe S.P.*, 2026 WL 1911656, at *4 (stating that the criminal convictions identified by Congress in § 1226(c) "were adjudicated with the full procedural protections of the criminal justice system").

In contrast, under § 1225(b)(2), there are no baked-in procedural protections attendant to an underlying criminal proceeding because that provision "requires only a determination that a noncitizen is an 'applicant for admission' who is 'not clearly and beyond a doubt entitled to be admitted.'" *Anthony Javier R.M.*, 2026 WL 1506306, at *5. Moreover, there are no "congressional findings under Section 1225(b)(2) like those discussed in the context of Section 1226(c) suggesting that a noncitizen who . . . has not been convicted of any criminal offense, and who is detained under Section 1225(b)(2) based on his allegedly unlawful presence in the United States, is likely to be a flight risk or a danger to the community." *Id.* (citing *Demore*, 538 U.S. at 518–21; S. Rep. No. 104 48, at 32 (1995) ("Congress should consider requiring that aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond.")); *Felipe S.P.*, 2026 WL 1911656, at *5 ("[U]nlike Section 1226(c), Section 1225(b)(2) is not accompanied by evidence-based congressional determinations about the need to detain all noncitizens in deportation proceedings."); *see also Manuel G. v. Blanche*, No. 26-cv-2385 (SRN/ECW), 2026 WL 1256358, at *3–4 (D. Minn. May 7, 2026) (distinguishing *Banyee* and *Demore* and finding they do not foreclose a due process challenge to mandatory detention under § 1225(b)(2)).

Both *Demore* and *Banyee* addressed the due process concerns presented by mandatory detention for a class of criminal noncitizens who have already received significant process through the criminal justice system and for whom the risks caused by their release were already the subject of congressional findings. The rationale underlying the conclusions in those cases that the Due Process Clause requires no individualized

determination for such detainees does not map onto the entire class of noncriminal applicants for admission who are now subject to mandatory detention under § 1225(b)(2) in the Eighth Circuit.

*Demore* and *Banyee* do not control the due process claim at issue for a second reason as well. Both cases considered whether the due process clause placed a limit on how long a noncitizen could be detained pursuant to § 1226(c). The court in *Banyee* described the question before it as "whether the year-long detention violated [petitioner's] rights . . . ." 115 F.4th at 931. Emphasizing the necessarily finite nature of § 1226(c) detention pending removal proceedings, the court found that Banyee's prolonged detention did not do so. *Id.* at 931–33. The court expressly rejected a multi-factor test which had been applied by the district court to determine when detention had become unconstitutionally long. *Id.* at 933 (finding "no room for a multi-factor 'reasonableness' test").

The *Demore* Court was likewise tasked with assessment of whether detention pending removal of "criminal aliens" violated due process and specifically noted that the average length of such detention was 47 days.[6] 538 U.S. at 529. The Court noted that this was shorter than the length of time presumptively allowed to effectuate removal in *Zadvydas v. Davis*, 533 U.S. 678 (2001). *Id.* at 528–29. Perhaps because Congress had already balanced the risk of flight and community danger risks presented by the "criminal alien" habeas petitioners in *Banyee* and *Demore*, the question in those cases focused on

[6] In its briefing to the Supreme Court in *Jennings v. Rodriguez*, 583 U.S. 281 (2019), the government later confirmed that "the statistics it gave to the Court in *Demore* were wrong," and "[d]etention normally lasts twice as long as the Government then said it did." *Id.* at 343 (Breyer, J., dissenting). The Court suspects those delays are even longer today.

whether detention during removal proceedings could violate due process because of its duration; in contrast to this case, the central question was not whether the detentions violated the due process clause at their inception. For these reasons, the Court concludes that Petitioner's due process claim is not precluded by *Banyee* or *Demore*.

***Thuraissigiam***

Similarly, the Court concludes that *Thuraissigiam* does not undermine Mr. G.D.'s due process claim. This is so because: (1) the petitioner in *Thuraissigiam* did not challenge the legality of his detention, but instead sought judicial review of the government's determination that he was ineligible for asylum; and (2) "*Thuraissigiam*'s holding, by its own language, is limited to noncitizens at the border—that is, those who are 'seeking initial entry.'" *Anthony Javier R.M.*, 2026 WL 1506306, at *6 (quoting *Thuraissigiam*, 591 U.S. at 139–40). By contrast, Mr. G.D. is not challenging his removability; instead, he raises a core habeas challenge, arguing that his current detention is unlawful because he has not been given due process protection related to his current detention. *Id.* (distinguishing *Thuraissigiam* because Anthony Javier R.M. "directly challenge[d] the lawfulness of his detention without a bond hearing"). In addition, Mr. G.D. has been in the United States for several years, during which time he has developed ties to the community.[7] *Id.* (observing that the "circumstances of Anthony Javier R.M.'s presence in the United States" entitled him to greater protections than one who has never established connections with this country

[7] In his Petition, Mr. G.D. shares that he has "strong local community ties through his work and family" (Dkt. 1 ¶ 52), and specifically that he "lives with his family and works at two different jobs seven days a week" in order to take care of his parents (*Id.* at ¶ 15).

and that "*Thuraissigiam* itself suggests that this distinction is material"); see also *Felipe S.P.*, 2026 WL 1911656, at *6 (finding *Thuraissigiam* "inapplicable" for the same reasons). For these reasons, *Thuraissigiam* does not foreclose Petitioner's due process claim.

Ultimately, the Court concludes that none of these cases preclude Petitioner's claim that he is due greater process than he has received before he can continue to be detained.

**C. The *Mathews* Balancing Test**

To resolve Petitioner's due process claim, the Court applies the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See also Anthony Javier R.M.*, 2026 WL 1506306, at *8–10 (applying *Mathews* to a similar claim); *Felipe S.P.*, 2026 WL 1911656, at *7–10 (same). Before doing so, however, the Court will address Respondents' threshold contention that the *Mathews*' framework is inapplicable in this context.

Respondents suggest that finding a right to liberty for noncitizens is, at bottom, an invocation of the doctrine of *substantive*, rather than *procedural*, due process, and must therefore satisfy the high bar set forth in *Washington v. Glucksberg*, 521 U.S. 702 (1997). (Dkt. 5 at 6.) Although *Glucksberg*'s requirements indeed establish a formidable threshold,[8] they do not apply here. As Judge Brasel explained in *Felipe S.P.*, "[b]ecause the fundamental interest at issue here—freedom from bodily restraint—is expressed in the Due Process Clause, government detention violates the Clause except 'in certain special and

[8] Under *Glucksberg*, substantive due process protects "fundamental rights and liberties which are . . . deeply rooted in this Nation's history and tradition, . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." 521 U.S. at 720–21. If the right asserted by a claimant is not a fundamental right or liberty interest, then the challenged government action or statute is permissible if it is "rationally related to legitimate government interests." *Id.* at 728.

narrow nonpunitive circumstances.'" 2026 WL 1911656, at *2 (quoting *Zadvydas*, 533 U.S. at 690) (quotation marks and footnote omitted). Unlike the "*unstated*" rights for which the *Glucksberg* test was developed, *id.* at *2 n.2, the right at stake here—liberty—is expressly enumerated in the Due Process Clause itself. *See, e.g.*, *Mirabelli v. Bonta*, 607 U.S. 492, 499 (2026 (Barrett, J., concurring) ("To mitigate [the risk of identifying unstated rights], the Court has crafted a demanding test for recognizing unexpressed rights: They must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'") (quoting *Glucksberg*, 521 U.S. at 721). The Court is not identifying an unenumerated right, but considering one stated in the Due Process Clause itself.

For essentially the same reason, the Court disagrees that the *Mathews* test is only applicable to assess whether the procedural process provided by the government is adequate to protect rights or interests awarded by statute. (Dkt. 5 at 8–9.) Though the *Mathews* test was created in a case assessing deprivation of a statutorily created right, it cannot be that rights created by statute are granted procedural protections when a right expressly enumerated in the Constitution is not. And the Supreme Court has repeatedly made clear that the protections of the Due Process Clause apply to persons here illegally. *Zadvydas*, 533 U.S. at 693 (2011) (collecting cases). Respondents' position that aliens without permission to be in the United States do not have any liberty interest beyond that afforded to them by statute runs afoul of this jurisprudence.[9] So, the undersigned joins the

[9] The Court concedes that the *Mathews* test arose from a distinct context and may not be a perfect fit here. But the government fails to suggest another test or analytical framework for considering Mr. G.D.'s due process argument, and the Court concludes that it is a useful framework for addressing the factors at issue in this case.

"federal courts around the country apply[ing *Mathews*] when analyzing what process the government owes noncitizens detained during removal proceedings, including those detained under Section 1225(b)(2)." *Felipe S.P.*, 2026 WL 1911656, at *7; see also *id.* at *7 n.4 (collecting cases).

Turning to application of *Mathews* itself, the test requires balancing three considerations: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 335.

First, as already explored above, the Court finds that continued detention of Mr. G.D. implicates a serious liberty interest. *See also supra* Section II.A. In light of Petitioner's continued detention in the Freeborn Adult Detention Center, the Court finds that the first factor weighs in Mr. G.D.'s favor. *Anthony Javier R.M.*, 2026 WL 1506306, at *8 (finding the first *Mathews* factor weighed in the petitioner's favor).

Next is the risk of erroneous deprivation of this liberty interest. In the detention context, "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001). As discussed above, the interests at issue here are: (1) ensuring that the noncitizen will appear for immigration proceedings; and (2) preventing danger to the community. *See Jennings*, 583 U.S. at 286. Here, it is evident that there is no way of

determining whether either of these two goals are advanced by Mr. G.D.'s detention without an individualized assessment of his case. The simple facts that, as interpreted by *Avila*, Mr. G.D. may be subject to mandatory detention under 8 U.S.C. § 1225(b)(2), isn't enough. (Dkt. 5 at 14–15.) To date, Respondents have not given Mr. G.D. any individualized review with respect to the need for his detention, and he has not received a hearing to contest whether his detention is necessary.

Ultimately, this Court agrees with others that have found there is a high risk of erroneous deprivation of liberty in this context without an individualized bond hearing to assess whether Petitioner's detention is necessary to ensure his appearance for immigration proceedings and prevent danger to the community. *Anthony Javier R.M.*, 2026 WL 1506306, at *9; *Felipe S.P.*, 2026 WL 1911656, at *8–9; *David J.C.P. v. Blanche*, No. 26 cv-2181 (DWF/ECW), 2026 WL 1102725, at *3 (D. Minn. Apr. 23, 2026); *Manuel G.*, 2026 WL 1256358, at *4–5; *Mejia-Briones v. Warden*, No. 1:26-CV-1109-RP, 2026 WL 1245750, at *3 (W.D. Tex. May 5, 2026) ("The second factor—the risk of erroneous deprivation—also weighs strongly in favor of Petitioner. Petitioner lacks any opportunity to contest the reasonableness of his detention, meaning the risk of erroneous deprivation lies in this 'automatic continued deprivation of liberty for a noncitizen.'").

Finally, the third *Mathews* factor concerns the government's interest, including the administrative burdens that additional procedures would impose. Respondents assert that the government "has a strong interest in the uniform administration of the immigration laws," including ensuring the presence of noncitizens at removal proceedings and

preserving the detention framework and IJ jurisdiction that Congress established under § 1225. (Dkt. 5 at 15.)

The Court acknowledges that these are important government interests. The Court also does not overlook that concluding the Due Process Clause requires Respondents to hold a bond hearing in this context could increase the government's burden. But until the Eighth Circuit's recent decision in *Avila*, the government routinely provided such bond hearings for detainees like Mr. G.D. and had done so for decades. And in the Circuits which have reached the opposite decision, courts continue to do so. *See, e.g.*, *Barbosa da Cunha v. Freden*, 175 F.4th 61, 72–73 (2d Cir. 2026) (finding that 8 U.S.C. § 1226(a), which includes a provision authorizing release on bond, applied to noncitizens who are present in the U.S. but charged as inadmissible for entering without inspection and admission). There is no suggestion in the record that the burden is unmanageable.

The government's interest in uniformly applying the law is also a valid concern. But again, other Courts of Appeals have reached the opposite conclusion from the Eighth Circuit in *Avila*. *See, e.g.*, *Rodriguez Vazquez v. Bostock*, No. 25-6842, 2026 WL 2196424, at *9 (9th Cir. July 30, 2026) (collecting circuit court decisions that have concluded that § 1225(b)(2)(A) does not apply to unadmitted noncitizens apprehended inside the United States); *Cirrus Rojas v. Olson*, No. 25-3127, 2026 WL 2198315, at *1 n.1 (7th Cir. July 30, 2026) (same). Respondents are, therefore, already required to routinely offer bond hearings to people in identical circumstances to Mr. G.D. in other districts, and requiring them to do so for him will not significantly change that landscape. Ultimately, the Court is not persuaded that these considerations outweigh Petitioner's substantial liberty interest.

For these reasons, the Court finds that Mr. G.D. has shown his due process rights are violated by his continued detention without additional procedural protections. The Court further finds: (1) that an individualized bond hearing is required, at which an immigration judge assesses whether his release would pose a risk of flight or a danger to the community; (2) Mr. G.D. is entitled to advance notice of the hearing sufficient to allow his counsel to attend and prepare; and (3) any decision to retain Mr. G.D. in custody after the bond hearing must set forth the reasons for his continued detention. If Respondents fail to provide Mr. G.D. with such a bond hearing within fourteen days, they must release him from detention.

## ORDER

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Petitioner Osvaldo G.D.'s Verified Petition for Writ of Habeas Corpus (Dkt. 1) is **GRANTED IN PART** and **DENIED IN PART.**

    a. The Petition is denied to the extent that Petitioner claims he is entitled to an order of immediate release due to an unlawful arrest.

    b. The Petition is granted to the extent that the Court concludes Petitioner's ongoing detention without an individualized bond hearing violates his due process rights.

    c. Respondents shall provide Petitioner with a bond hearing at which an individual assessment is made regarding his risk of flight and whether releasing him will pose a danger to the community. This hearing must take place **within two weeks from the date of this Order.** Respondents must provide Petitioner and his counsel with advanced notice of the hearing promptly after it is scheduled, sufficient to allow his counsel time to prepare and ability to attend.

    d. If a bond hearing does not take place within two weeks, or if the Immigration Judge declines to reach the merits of the issue or determines

that they lack the authority to do so, the Respondents shall immediately release Petitioner from custody in Minnesota with his personal effects.

2. Respondents shall file a status report with the Court within 48 hours of the conclusion of the bond hearing or Respondents' decision to release Petitioner from custody detailing the results of the bond hearing or its actions related to release.

**Let Judgment be entered accordingly.**

Date: November 18, 2026

*s/ Katherine M. Menendez*
Katherine M. Menendez
U.S. District Court Judge